DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**CORRECTIONS CORPORATION OF AMERICA, INC.,** a Foreign
Corporation,
Appellant,

v.

**CITY OF PEMBROKE PINES,** a Florida Municipal Corporation; and **CCA
PROPERTIES OF AMERICA, LLC,** a Tennessee Limited Liability
Company,
Appellees.

No. 4D14-4815

[November 1, 2017]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Carol-Lisa Philips, Judge; L.T. Case No. 12-007337 CACE (25).

Leonard K. Samuels, Paul S. Figg and Ashley Dillman Bruce of Berger Singerman LLP, Fort Lauderdale, for appellant.

Usher L. Brown and Victor Kline of Greenspoon Marder, P.A., Orlando, for appellee City of Pembroke Pines.

Alfredo Marquez-Sterling and Keith M. Poliakoff of Arnstein & Lehr LLP, Fort Lauderdale, for Amicus Curiae the Town of Southwest Ranches.

***ON MOTION FOR REHEARING***

CIKLIN, J.

We grant appellee's motion for rehearing in part, withdraw our previously issued opinion, and substitute the following in its place to correct an erroneous factual reference.

Corrections Corporation of America ("CCA") appeals a trial court order—sounding in declaratory relief—holding that the City of Pembroke Pines did not have a duty to provide water and sewer services to CCA's property site, as well as a final order dismissing CCA's counterclaims. Because we find that Pembroke Pines affirmatively expressed its intention

to assume such a duty, we reverse the order determining that Pembroke Pines did not. Because it appears the trial court dismissed CCA's counterclaims based on its determination that Pembroke Pines did not have a duty to CCA, we also reverse the order dismissing CCA's counterclaims.

## Background

CCA sought sewer and water services from Pembroke Pines for its property located in the Town of Southwest Ranches but adjacent to Pembroke Pines ("the CCA site"). Pembroke Pines operates potable water and sewer systems that service properties within its boundaries, as well as some properties outside of those boundaries. Those services provided outside of the boundaries extend to a limited number of residential and commercial properties. Southwest Ranches does not have potable water or sewer systems to service its residents, and Pembroke Pines is the only provider in the area. The CCA site is surrounded by four other properties, all of which are, or were at one time, serviced by Pembroke Pines' water or sewer systems (or both). Only one of these properties is actually located within the boundaries of Pembroke Pines.[1] At all times relevant to this dispute, Pembroke Pines admitted that it had the capacity and infrastructure in place to provide water and sewer services to the CCA site through its systems that abut the site.

In 2005, CCA and Southwest Ranches entered into an agreement concerning the development of a correctional facility on the CCA site. The agreement provided that "all required water, sewer and other utility services are available" at the CCA site. CCA was advised that while a water and sewer agreement with Pembroke Pines would be required, it was unclear whether the Pembroke Pines City Commission would grant those services. However, later in 2005, Southwest Ranches entered into an interlocal agreement with Pembroke Pines regarding local roadways and other matters ("Roadways ILA"), in which Pembroke Pines agreed not to interfere with the development or operation of CCA's jail facility:

> Jail Facility. [Pembroke Pines] shall not interfere with [CCA's], or its successors or assigns, development and/or operation of the jail facility, or with [Southwest Ranches]'s Agreement with [CCA] concerning development of same.

---

[1] One of the properties was a women's prison, which is no longer operational. Another property is a future county jail site. Pembroke Pines also provides water and sewer services to Everglades National Park, which is located outside of the boundaries, and near the CCA site.

In 2011, Immigration and Customs Enforcement ("ICE") tentatively selected the CCA site to build a new detention facility. A few days later, Pembroke Pines and Southwest Ranches entered into another interlocal agreement concerning emergency medical and fire services (the "EMS ILA") that provided in pertinent part:

> *Jail Facility:* [Pembroke Pines] acknowledges that it has sufficient capacity to deliver emergency medical protection and fire prevention services to [Southwest Ranches]'s future 2,500 bed detention/corrections facility, located on property currently owned by [CCA]. [Pembroke Pines] agrees to timely provide Broward County, upon request, any documentation that Broward County may require to acknowledge that Pembroke Pines has the capacity, ability, and the willingness to service this facility under the terms and conditions contained herein. . . . Further, [Pembroke Pines] agrees that it has sufficient capacity to provide water and sewer service to [Southwest Ranches]'s future 2,500 bed detention/corrections facility (approximately 500,000 gross square feet of floor area), *and that it will expeditiously approve a water/waste water utility agreement to provide such service, at [Pembroke Pines]'s then prevailing rate, in accordance with state law* ([Pembroke Pines]'s rate + surcharge).

(Emphasis added). In a special meeting on June 27, 2011, the Pembroke Pines City Commission voted on and approved the EMS ILA in Resolution No. 3312.

Some five months later, in December 2011, the City Commission passed yet another affirmative motion, that one being "to approve direction that, should CCA come forward with a request for Pembroke Pines to provide them water and sewer service, that the water and sewer agreement stipulate that it would be for not more than 1,500 beds based on the Engineer's report" (the "December 2011 Motion"). CCA then submitted to Pembroke Pines a proposed Water and Sewer Installation and Service Agreement (the "W & S Agreement") for a 1,500–bed facility, and requested that the matter be finalized at the first available City Commission meeting. Pursuant to the EMS ILA, the Pembroke Pines city attorney and the Pembroke Pines city manager agreed on the contractual terms with CCA and the W & S Agreement was then submitted to the City Commission. In an abrupt departure from the numerous manifestations of intent expressed by the Pembroke Pines City Commission over the previous six years, the City Commission did not vote on the W & S Agreement and quite

3

to the contrary, formally adopted a resolution *expressing its opposition* to erecting the ICE detention center on the CCA site. In a later meeting, the City Commission voted to both terminate the EMS ILA and, because it was "in doubt as to its rights and obligations," and to direct the city attorney to seek declaratory relief.

In its action for declaratory judgment, Pembroke Pines sought a ruling that it was not required to provide CCA with water and sewer services or, if it was required to provide utility services, a determination of "whether there [were] any limitations on the obligation to provide service." Following trial, the court entered an order determining that Pembroke Pines did not, in fact, have a duty to provide water and sewer services to CCA.

## Analysis

On appeal, CCA argues that Pembroke Pines assumed a legally enforceable duty to provide the CCA site with those services by expressly manifesting a desire or intent to provide the services. CCA maintains the evidence at trial established that the ongoing conduct of Pembroke Pines created a duty to provide utilities. As such, the trial court's rulings concerned a question of fact that "must be sustained if supported by competent substantial evidence." *Bellino v. W & W Lumber & Bldg. Supplies, Inc.,* 902 So. 2d 829, 832 (Fla. 4th DCA 2005) (quoting *State v. Glatzmayer,* 789 So. 2d 297, 301 n.7 (Fla. 2001)). We agree with CCA.

As a general rule, "a municipality has no duty to supply services to areas outside its boundaries." *Allen's Creek Props., Inc. v. City of Clearwater,* 679 So. 2d 1172, 1174 (Fla. 1996). In *Allen's Creek,* the Florida Supreme Court recognized exceptions to this general rule where (1) a municipality has agreed to extend its services by contract, and (2) where a municipality has assumed a duty to provide such services through its conduct. *Id.* at 1175-76.

With regard to the conduct exception, the court explained:

> According to the jurisdictions that recognize this exception, a municipality that holds itself out as a public utility for a particular area outside its city limits has a duty to supply everyone in that area. . . .
>
> We agree that through its conduct a municipality may assume the legal duty to provide reasonably adequate services for reasonable compensation to all of the public in an unincorporated area. *See City of Winter Park v. Southern*

4

> *States Utilities, Inc.*, 540 So. 2d 178, 180 (Fla. 5th DCA 1989) (city's passage of ordinance requiring property owners outside the city but within a zone designated by the ordinance to connect to the city's sewer service when available was conduct sufficient to bring into effect law applicable to public utilities). We add however that *the conduct must expressly manifest the municipality's desire or intent to assume that duty.* A municipality's decision to provide service without restriction in an area outside its boundaries would meet this requirement.

*Id.* at 1176 (emphasis added).

*Allen's Creek* presents a scenario somewhat similar to the one at hand. There, Allen's Creek owned a parcel of land located in the unincorporated area of Pinellas County, but adjacent to Clearwater. *Id.* at 1174. When Allen's Creek submitted a site development plan to Pinellas County, Pinellas officials directed Allen's Creek to Clearwater for sewer services because the parcel was located within Clearwater's sanitary sewer service district. *Id.* Clearwater informed Allen's Creek that it would have to consent to annexation before receiving sewer services. *Id.* Allen's Creek declined and filed suit for declaratory judgment. *Id.*

On appeal to the Florida Supreme Court, Allen's Creek argued that the conduct exception to the general rule applied, as Clearwater had assumed an obligation to provide sewer service in its designated service area through the Central Pinellas County 201 Facilities Plan ("201 Plan") and its interlocal agreement with the City of Largo. *Id.* at 1175-76. The interlocal agreement between Clearwater and the City of Largo designated service areas and stated, "The parties shall have the exclusive right to provide wholesale and retail sanitary sewer service within the area allocated to such part and further agree not to compete with each other as to the provision of such sewer service outside their designated area." *Id.* at 1175.[2]

The 201 Plan was created in connection with the Federal Water Pollution Control Act of 1972, the goal of which was "to eliminate the discharge of pollutants into navigable waters by 1985," and a provision of which was federal "funding for the research and development of wastewater treatment management plans." *Id.* at 1174. Within the 201

---

[2] The court clarified that the use of the word "exclusive" to describe the service areas is misleading, because Allen's Creek could have sought services from alternative sources. *Id.* at 1176 n.5.

Plan, "service areas" were designated "to determine the scope of facilities needed in the future." *Id.* Allen's Creek's property was within Clearwater's service area as designated by the plan. *Id.* Clearwater approved the 201 Plan by local resolution in 1978, but the EPA rejected it, so the plan was never implemented and Clearwater proceeded with development of alternative methods for wastewater disposal. *Id.*

The supreme court declined to extend the conduct exception to Allen's Creek, reasoning:

> [*N]othing in either the Plan or agreement affirmatively states that Clearwater will provide services to the unincorporated area.* Nor do these agreements preclude those located outside Clearwater's city limits but within its service area from seeking services from an alternative source.
>
> . . . .
>
> . . . We find that the agreements entered by Clearwater in this case did not affirmatively express the City's intent to supply sewer service to the unincorporated portion of its sewer service area. Nor did Clearwater engage in any other conduct that expressed the intent to serve this area.

*Id.* at 1176-77 (emphasis added). The court concluded that Clearwater's annexation requirements were therefore permissible, so long as the requirements were reasonably justified and consistently applied. *Id.*

While similar to the facts of the instant case, *Allen's Creek* is somewhat distinguishable. There, the 201 Plan and interlocal agreement on which Allen's Creek relied were in place before it requested service from the city. As an apparent consequence, the court looked to the agreements at issue for "affirmative[] state[ments] that Clearwater will provide services to the unincorporated area." *Id.* at 1176. In other words, the court reviewed the documents for expressions of Clearwater's intent to provide utility services to anyone located within the specific, unincorporated service area. *Id.*

Here, on the other hand, CCA relies on documents *specifically addressing* the CCA site. Applying *Allen's Creek* to the agreements at hand, we find direct expressions of intent to provide services to the area at issue in the EMS ILA:

> *Jail Facility:* . . . [Pembroke Pines] agrees to timely provide Broward County, upon request, any documentation that

6

Broward County may require to acknowledge that Pembroke Pines has the capacity, ability, and the willingness to service this facility . . . . Further, [Pembroke Pines] agrees that it has sufficient capacity to provide water and sewer service to [Southwest Ranches]'s future 2,500 bed detention/corrections facility (approximately 500,000 gross square feet of floor area), *and that it will expeditiously approve a water/waste water utility agreement to provide such service, at [Pembroke Pines]'s then prevailing rate, in accordance with state law* ([Pembroke Pines]'s rate + surcharge).

(Emphasis added). By including a statement that it would "approve a water/waste water agreement to provide such service," Pembroke Pines affirmatively and expressly manifested its desire and intent to assume that duty.

Further, although they may not constitute *affirmative* expressions of intent to provide water and sewer service, other actions of the City of Pembroke Pines indicated its willingness to provide services to the CCA site. Pembroke Pines provided these services to all surrounding sites. Also, knowing that it was the only water and sewer service provider in the area, Pembroke Pines agreed in the Roadways ILA that it "shall not interfere with [CCA's] . . . development and/or *operation* of the jail facility." Finally, Pembroke Pines indicated its willingness to provide these services by the City Commission's passage of the December 2011 motion to direct CCA to limit its request for water and sewer services to a 1,500-bed facility.

In fact, Pembroke Pines's procedures as outlined in its Code of Ordinances support our finding of an express manifestation of intent. The Code specifies that "property located outside the city limits shall not be allowed to connect to a city utility system unless the connection is authorized by the City Commission," and that "[n]o action of the Commission . . . shall be valid or binding unless adopted by the affirmative vote of three (3) members of the Commission." *See* Pembroke Pines, Fla., Code of Ordinances §§ 3.07(e), 50.10(B). While the Commission did not vote on CCA's proposed W & S Agreement, which provided the negotiated terms and conditions of utility services, it did vote on and approve the EMS ILA in Resolution No. 3312, in which the City agreed that it would approve a water/wastewater utility agreement. As a consequence of the City Commission's approval of the EMS ILA, CCA may have reasonably expected that Pembroke Pines's agreement to provide utility services was valid and binding.

Respectfully, the dissent misses the point and instead focuses its

7

analysis on the question of whether a basic enforceable contract was formed (or whether it was just "an agreement to agree") to reach its conclusion that Pembroke Pines is not bound to provide water and sewer services to CCA. We are bound by the principles of law outlined in *Allen's Creek*, which clearly elevate the issue in this particular case beyond simple contractual interpretation. The ILA is *not* a contract between the parties to this action, and therefore analysis of it as such is misplaced and is simply an irrelevant exercise. *Allen's Creek* does not direct us to ascertain the enforceability of the ILA *as a contract*; instead, it compels us to *look for conduct* that "expressly manifest[s] the municipality's desire or intent to assume that duty." *See* 679 So. 2d at 1176. We find such an express manifestation in the language of the EMS ILA and in the City Commission's passage of a resolution approving the EMS ILA—plus the numerous other forms of assent discussed herein.

Consequently, we find that the conduct exception to the general rule that a municipality has no duty to supply services to areas outside its boundaries applies in the instant case. We reverse the trial court's determination to the contrary.

*Reversed and remanded for further proceedings.*

TAYLOR, J., concurs.
KLINGENSMITH, J., dissents with opinion.

KLINGENSMITH, J., dissenting.

Although municipalities typically do not have a duty to supply services to areas outside their boundaries, I recognize that a municipality may be required to supply services outside its boundaries if its conduct expressly manifested the desire or intent to assume such a duty. *See Allen's Creek Props., Inc. v. City of Clearwater*, 679 So. 2d 1172, 1174–76 (Fla. 1996). However, this exception, which is rooted in the concepts of detrimental reliance and estoppel, does not apply here. CCA could not reasonably claim detrimental reliance because Pembroke Pines never expressly manifested its desire to such an extent as to impose the duty of providing services to the CCA site. Accordingly, I dissent from the majority's opinion.

In the EMS ILA, Pembroke Pines expressed only a nascent willingness to service some future facility. The stated desire to "expeditiously approve a water/waste water utility agreement" was insufficient to constitute an affirmative, express manifestation of Pembroke Pines' unreserved intent. Rather, the language of the EMS ILA was only an implicit expression of possible *future* intent, devoid of an affirmative expression of *present* intent

8

resembling a formal enactment of an ordinance or resolution. The EMS ILA is best described as nothing more than an "agreement to make an agreement," which is unenforceable under Florida law. *See Irby v. Mem'l Healthcare Grp.*, 901 So. 2d 305, 306 (Fla. 1st DCA 2005).

After the EMS ILA was approved, CCA submitted to Pembroke Pines a proposed Water & Sewer Agreement for a 1,500-bed facility, requesting that the agreement be finalized at the next City Commission meeting because CCA knew that any water and sewer connection for the CCA site would ultimately require formal approval by a vote of the City Commission.[3] However, the City Commission never approved the agreement for services with CCA. Instead, the City Commission voted to adopt a resolution expressing its opposition to erecting the ICE detention center on the CCA site.

Thus, CCA proceeded on the incorrect assumption that Pembroke Pines could not change its collective mind on its willingness to agree to provide utility services, failing to consider that it is not uncommon for a municipality to embark on a prospective plan of action only to later reverse course due to its citizens' disapproval. Respect for the separation of powers precludes us from substituting our own collective judgment for that of Pembroke Pines' elected leaders who are, and must remain, accountable to their citizens for any policy decisions they make.

Moreover, although Pembroke Pines previously provided some utility services to customers outside its boundaries, it did so only in limited situations. In light of CCA's awareness that compliance with the applicable provisions of the Code of Ordinances was required, these circumstances on the whole did not amount to an affirmative expression of Pembroke Pines' unreserved intent to assume the duty of providing utility services to the CCA site. *See Allen's Creek*, 679 So. 2d at 1176 ("Providing service outside its boundaries in only limited situations, as Clearwater has done here, does not amount to an affirmative expression of intent to serve all in the area.").

---

[3] In fact, section 50.10(B) of the Pembroke Pines Code of Ordinances (2012), states that "property located outside the city limits shall not be allowed to connect to a city utility system unless the connection is authorized by the City Commission." This authorization can only occur as provided by section 3.07(e) of the Charter of the City of Pembroke Pines, which states, "[n]o action of the Commission . . . shall be valid or binding unless adopted by the affirmative vote of three (3) members of the Commission."

To conclude, this new majority opinion discusses nothing of significance that was overlooked the first time we considered the issue. That the City Commission formally approved the EMS ILA does not change its wording; all that happened was that the City Commission approved at that point an unenforceable "agreement to agree." The majority's opinion should give every local government in this state considerable pause, as it now holds that a city can now be bound by its mere favorable expressions of future intent despite no formal approval by the city's governing body, no contract, and no estoppel created by detrimental reliance. Which, it seems, is plenty for the majority to find that an enforceable duty was created against Pembroke Pines. This "plenty," however, "is plenty of nothing, and, apparently, nothing is plenty for th[is] Court." *See Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1335 (2016) (Roberts, C.J., dissenting).

*     *     *

**_Not final until disposition of timely filed motion for rehearing._**