DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**CITY OF PEMBROKE PINES,**
Appellant,

v.

**CORRECTIONS CORPORATION OF AMERICA, INC.**,
n/k/a CoreCivic, Inc.,
Appellee.

No. 4D18-3168

[May 29, 2019]

Appeal of nonfinal order from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Carol-Lisa Phillips, Judge; L.T. Case No. 12-007337 (25).

E. Bruce Johnson and Hudson C. Gill of Johnson, Anselmo, Murdoch, Burke, Piper & Hochman, P.A., Fort Lauderdale, for appellant.

Leonard K. Samuels, Paul S. Figg and Ashley Dillman Bruce of Berger Singerman, LLP, Fort Lauderdale, for appellee.

GERBER, C.J.

The City of Pembroke Pines appeals from the circuit court's order denying its motion to dismiss, on sovereign immunity grounds, Corrections Corporation of America's counterclaim seeking non-contractual economic damages alleged in counts for declaratory judgment, promissory estoppel, tortious interference with contract, and tortious interference with an advantageous business relationship. The City argues that the sovereign immunity waiver codified in section 768.28, Florida Statutes (2012), does not apply to these four counts.

We agree with the City. We reverse and remand for entry of a final order dismissing these four counts on sovereign immunity grounds.

We present this opinion in three parts:
1. Factual background;
2. Procedural history; and
3. This appeal.

## 1. *Factual Background*

The factual background underlying these claims was set forth in *Corrections Corporation of America, Inc. v. City of Pembroke Pines*, 230 So. 3d 477 (Fla. 4th DCA 2017) ("*Pembroke Pines I*"):

> CCA sought sewer and water services from Pembroke Pines for its property located in the Town of Southwest Ranches but adjacent to Pembroke Pines ("the CCA site"). Pembroke Pines operates potable water and sewer systems that service properties within its boundaries, as well as some properties outside of those boundaries. Those services provided outside of the boundaries extend to a limited number of residential and commercial properties. Southwest Ranches does not have potable water or sewer systems to service its residents, and Pembroke Pines is the only provider in the area. The CCA site is surrounded by four other properties, all of which are, or were at one time, serviced by Pembroke Pines' water or sewer systems (or both). Only one of these properties is actually located within the boundaries of Pembroke Pines. At all times relevant to this dispute, Pembroke Pines admitted that it had the capacity and infrastructure in place to provide water and sewer services to the CCA site through its systems that abut the site.

> In 2005, CCA and Southwest Ranches entered into an agreement concerning the development of a correctional facility on the CCA site. The agreement provided that "all required water, sewer and other utility services are available" at the CCA site. CCA was advised that while a water and sewer agreement with Pembroke Pines would be required, it was unclear whether the Pembroke Pines City Commission would grant those services. However, later in 2005, Southwest Ranches entered into an interlocal agreement with Pembroke Pines regarding local roadways and other matters ("Roadways ILA"), in which Pembroke Pines agreed not to interfere with the development or operation of CCA's jail facility:

> > Jail Facility. [Pembroke Pines] shall not interfere with [CCA's], or its successors or assigns, development and/or operation of the jail facility, or with [Southwest

2

Ranches]'s Agreement with [CCA] concerning development of same.

In 2011, Immigration and Customs Enforcement ("ICE") tentatively selected the CCA site to build a new detention facility. A few days later, Pembroke Pines and Southwest Ranches entered into another interlocal agreement concerning emergency medical and fire services (the "EMS ILA") that provided in pertinent part:

> *Jail Facility:* [Pembroke Pines] acknowledges that it has sufficient capacity to deliver emergency medical protection and fire prevention services to [Southwest Ranches]'s future 2,500 bed detention/corrections facility, located on property currently owned by [CCA]. [Pembroke Pines] agrees to timely provide Broward County, upon request, any documentation that Broward County may require to acknowledge that Pembroke Pines has the capacity, ability, and the willingness to service this facility under the terms and conditions contained herein . . . Further, [Pembroke Pines] agrees that it has sufficient capacity to provide water and sewer service to [Southwest Ranches]'s future 2,500 bed detention/corrections facility (approximately 500,000 gross square feet of floor area), *and that it will expeditiously approve a water/waste water utility agreement to provide such service, at [Pembroke Pines]'s then prevailing rate, in accordance with state law* ([Pembroke Pines]'s rate + surcharge).

(Emphasis added). In a special meeting on June 27, 2011, the Pembroke Pines City Commission voted on and approved the EMS ILA in Resolution No. 3312.

Some five months later, in December 2011, the City Commission passed yet another affirmative motion, that one being "to approve direction that, should CCA come forward with a request for Pembroke Pines to provide them water and sewer service, that the water and sewer agreement stipulate that it would be for not more than 1,500 beds based on the Engineer's report" (the "December 2011 Motion"). CCA then submitted to Pembroke Pines a proposed Water and Sewer Installation and Service Agreement (the "W & S Agreement") for a 1,500–bed facility, and requested that the matter be

3

finalized at the first available City Commission meeting. Pursuant to the EMS ILA, the Pembroke Pines city attorney and the Pembroke Pines city manager agreed on the contractual terms with CCA and the W & S Agreement was then submitted to the City Commission. In an abrupt departure from the numerous manifestations of intent expressed by the Pembroke Pines City Commission over the previous six years, the City Commission did not vote on the W & S Agreement and quite to the contrary, formally adopted a resolution *expressing its opposition* to erecting the ICE detention center on the CCA site. In a later meeting, the City Commission voted to . . . terminate the EMS ILA . . . .

*Id.* at 478-79 (internal footnote omitted).

## 2. *Procedural History*

### a. *Pembroke Pines I*

The City filed an action for declaratory judgment, seeking a ruling that it was not required to provide CCA with water and sewer services or, if it was required to provide utility services, a determination of "whether there [were] any limitations on the obligation to provide service." *Id.* at 479. Following a trial, the circuit court entered an order determining that the City did not have a duty to provide water and sewer services to CCA. *Id.* at 479-80.

CCA appealed, arguing that the City assumed a legally enforceable duty to provide the CCA site with those services by expressly manifesting a desire or intent to provide the services. *Id.* at 480. CCA maintained the evidence at trial established that the City's conduct created a duty to provide utilities.

We agreed with CCA in *Pembroke Pines I*, reasoning in pertinent part:

As a general rule, "a municipality has no duty to supply services to areas outside its boundaries." *Allen's Creek Props., Inc. v. City of Clearwater*, 679 So. 2d 1172, 1174 (Fla. 1996). In *Allen's Creek*, the Florida Supreme Court recognized exceptions to this general rule where (1) a municipality has agreed to extend its services by contract, and (2) where a municipality has assumed a duty to provide such services through its conduct. *Id.* at 1175–76.

4

. . . .

Applying *Allen's Creek* to the agreements at hand, we find direct expressions of intent to provide services to the area at issue in the EMS ILA:

> *Jail Facility:* . . . [Pembroke Pines] agrees to timely provide Broward County, upon request, any documentation that Broward County may require to acknowledge that Pembroke Pines has the capacity, ability, and the willingness to service this facility . . . . Further, [Pembroke Pines] agrees that it has sufficient capacity to provide water and sewer service to [Southwest Ranches]'s future 2,500 bed detention/corrections facility (approximately 500,000 gross square feet of floor area), *and that it will expeditiously approve a water/waste water utility agreement to provide such service, at* [*Pembroke Pines*]*'s then prevailing rate, in accordance with state law* ([Pembroke Pines]'s rate + surcharge).

(Emphasis added). By including a statement that it would "approve a water/waste water agreement to provide such service," Pembroke Pines affirmatively and expressly manifested its desire and intent to assume that duty.

Further, although they may not constitute *affirmative* expressions of intent to provide water and sewer service, other actions of the City of Pembroke Pines indicated its willingness to provide services to the CCA site. Pembroke Pines provided these services to all surrounding sites. Also, knowing that it was the only water and sewer service provider in the area, Pembroke Pines agreed in the Roadways ILA that it "shall not interfere with [CCA's] . . . development and/or *operation* of the jail facility." Finally, Pembroke Pines indicated its willingness to provide these services by the City Commission's passage of the December 2011 motion to direct CCA to limit its request for water and sewer services to a 1,500-bed facility.

. . . While the Commission did not vote on CCA's proposed W & S Agreement, which provided the negotiated terms and conditions of utility services, it did vote on and approve the EMS ILA in Resolution No. 3312, in which the City agreed that it would approve a water/wastewater utility agreement. As a

5

consequence of the City Commission's approval of the EMS ILA, CCA may have reasonably expected that Pembroke Pines's agreement to provide utility services was valid and binding.

. . . .

Consequently, we find that the conduct exception to the general rule that a municipality has no duty to supply services to areas outside its boundaries applies in the instant case. We reverse the trial court's determination to the contrary.

*Id.* at 480-82.

### b. *The Instant Case*

While the appeal in *Pembroke Pines I* was occurring, ICE notified Southwest Ranches that ICE would not build a detention center on the CCA site. With no detention center to build, CCA sold the CCA site to Southwest Ranches.

CCA then filed its second amended counterclaim against the City. CCA generally alleged that in reliance on the City's representations that the City would provide water and sewer service to the CCA site, CCA incurred substantial costs, including the purchase price and carrying costs of the CCA site, payments to Southwest Ranches under the CCA–Southwest Ranches agreement, and payments of professional fees for development work. CCA further alleged that the City's ultimate refusal to provide water and sewer service to the CCA site thwarted the development of the ICE facility and deprived CCA of the economic viability of the CCA site.

Based on those and other general allegations, CCA's second amended counterclaim specifically alleged six counts against the City, four of which are relevant here: Count I for declaratory judgment; Count II for promissory estoppel; Count V for tortious interference with contract; and Count VI tortious interference with advantageous business relationship.

In Count I, CCA alleged that because of the City's refusal to provide water and sewer service to the CCA site, CCA was entitled to supplemental relief in the form of damages and costs.

In Count II, CCA alleged that its reliance on the City's representations was reasonable, for which it sought damages and costs, including damages for the purchase price and carrying costs of the CCA site,

payments to Southwest Ranches under the CCA–Southwest Ranches agreement, and payments of professional fees for development work.

In Count V, CCA alleged that the City's refusal to provide water and sewer service to the CCA site interfered with the CCA–Southwest Ranches Agreement to develop a correctional facility on the CCA site, for which CCA had suffered damages, including lost profits and costs.

In Count VI, CCA alleged that the City's refusal to provide water and sewer service to the CCA site interfered with CCA's advantageous business relationship with ICE to develop a correctional facility on the CCA site, for which CCA had suffered damages, including lost profits and costs.

The City moved to dismiss CCA's second amended counterclaim. The City argued, among other grounds, that sovereign immunity barred CCA's state law claims for declaratory relief, promissory estoppel, tortious interference with contract, and tortious interference with advantageous business relationship, because those claims sought only economic damages not based on express contracts between the City and CCA, and were not based on personal injury, wrongful death, or physical property damages. According to the City, the dismissal of those four claims would be in line with Florida cases finding that, based on sovereign immunity, (1) property owners cannot recover for the harm caused by the decision-making process, and (2) no state tort liability exists for allegedly wrongful denials of development-related applications.

The circuit court ultimately entered an order denying the City's motion to dismiss, expressly finding that the City "is not entitled to its defense and assertion of sovereign immunity for the state law claims that have been set forth in Counts I, II, [V] and VI of the Second Amended Counter-claim (Declaratory Judgment, Promissory Estoppel, Tortuous [sic] Interference with Contract, and Tortuous [sic] Interference with an Advantageous Business Relationship), which requests economic damages."

### 3. *This Appeal*

This appeal followed. The City argues that the circuit court erred in finding, as a matter of law, that the City was not entitled to sovereign immunity for: (1) CCA's state law tort claims which do not seek damages for injury or loss of property, personal injury, or death, but instead seek damages for economic losses in the form of lost profits; and (2) CCA's state law declaratory judgment claim seeking supplemental relief in the form of economic damages.

7

CCA's answer brief raises three arguments, including sub-arguments as specified:

(1) the order is not reviewable under Florida Rule of Appellate Procedure 9.130(a)(3)(C)(xi) (providing jurisdiction over nonfinal orders which determine that, "as a matter of law, a party is not entitled to sovereign immunity"), because
    (a) the City's underlying conduct was not a discretionary function, which is fundamental to sovereign immunity, and
    (b) this court already concluded in *Pembroke Pines I* that CCA's claims are based on the City's operational decision not to perform its obligation to provide water and sewer service to the CCA site;
(2) if CCA's claims do not fall within section 768.28's statutory waiver of sovereign immunity because the claims seek economic damages, then the City still is liable at common law for actions in its propriety capacity as a municipal corporation; and
(3) section 768.28 does not distinguish between torts on the basis of the type of damages sought or the specific causes of action.

The parties agree that our review is de novo. *See Town of Gulf Stream v. Palm Beach Cty.*, 206 So. 3d 721, 725 (Fla. 4th DCA 2016) ("The issue of sovereign immunity is a legal issue subject to the de novo standard of review.").

We conclude that the City is entitled to sovereign immunity on CCA's state law tort claims and state law declaratory judgment claim. We base our conclusion on five grounds.

First, we conclude the order is reviewable under Florida Rule of Appellate Procedure 9.130(a)(3)(C)(xi). The rule's plain language provides appellate jurisdiction over nonfinal orders which determine that, "as a matter of law, a party is not entitled to sovereign immunity," which is exactly the type of nonfinal order on review in this appeal.

Second, contrary to CCA's answer brief, the City's underlying conduct was discretionary in nature. Discretionary or planning level functions "are generally interpreted to be those requiring basic policy decisions, while operational level functions are those that implement policy." *Com. Carrier Corp. v. Indian River Cty.*, 371 So. 2d 1010, 1021 (Fla. 1979). Here, the City Commission's ultimate adoption of a resolution opposing the construction of an ICE detention center on the CCA site, followed by a vote to terminate the EMS ILA, were clearly basic policy decisions made at the City's highest level.

8

Third, contrary to CCA's answer brief, we did not conclude in *Pembroke Pines I* that CCA's claims are based on the City's operational decision not to perform on its obligation to provide water and sewer service to the CCA site. *Pembroke Pines I* did not involve any determination of sovereign immunity or, more specifically, whether the City's ultimate decision not to provide water and sewer service to the CCA site was discretionary or operational in nature. *Pembroke Pines I* merely decided whether the conduct exception to the general rule that a municipality has no duty to supply services to areas outside its boundaries applied in the underlying case. 230 So. 3d at 482. Now presented in this appeal is the question of whether the City's ultimate decision not to provide water and sewer service to the CCA site was discretionary or operational in nature. As stated above, we conclude that the decision was clearly discretionary in nature.

Fourth, contrary to CCA's answer brief, the City, as a municipal corporation, is equally situated with all other constitutionally authorized governmental entities as to when sovereign immunity applies. *See Com. Carrier*, 371 So. 2d at 1016 (municipalities are "unequivocally included within the definition of 'state agencies or subdivisions'" as used in section 768.28); *Cauley v. City of Jacksonville*, 403 So. 2d 379, 385-86 (Fla. 1981) ("We note that section 768.28 also furthers the philosophy of Florida's present constitution that all local governmental entities be treated equally. . . . Municipalities can no longer be identified as partial outcasts as opposed to other constitutionally authorized local governmental entities.").

Fifth, the plain language of section 768.28's limited waiver of sovereign immunity does not apply to CCA's state law tort claims which are not based on "injury or loss of property, personal injury, or death caused by the negligent or wrongful act or omission of any employee of the agency or subdivision while acting within the scope of the employee's office or employment . . . ." Section 768.28(1) states, in pertinent part:

> [T]he state, for itself and for its agencies or subdivisions, hereby waives sovereign immunity for liability for torts, *but only to the extent specified in this act*. Actions at law against the state or any of its agencies or subdivisions to recover damages in tort for money damages against the state or its agencies or subdivisions for *injury or loss of property, personal injury, or death caused by the negligent or wrongful act or omission of any employee of the agency or subdivision while acting within the scope of the employee's office or employment* under circumstances in which the state or such agency or subdivision, if a private person, would be liable to the

9

claimant, in accordance with the general laws of this state, may be prosecuted subject to the limitations specified in this act.

(emphasis added).

Persuasive authority for our conclusion is derived from the Fifth District's decision in *County of Brevard v. Miorelli Engineering, Inc.*, 677 So. 2d 32 (Fla. 5th DCA 1996), *quashed on other grounds*, 703 So. 2d 1049 (Fla. 1997). In *Miorelli*, an engineering firm contracted with Brevard County to construct a spring training facility. *Id.* at 33. The firm began developing the facility. *Id.* However, a dispute arose between the county and the firm. *Id.* The county ultimately terminated the firm and withheld the remaining amounts due under the contract. *Id.* The firm filed suit against the county seeking to recover those withheld amounts, as well as payment for extra work, under claims for breach of contract, quantum meruit, fraudulent inducement, and common law fraud. *Id.*

The county filed a motion for summary judgment, asserting sovereign immunity. *Id.* The circuit court granted the county's motion as to the quantum meruit and common law fraud claims, but concluded that sovereign immunity did not bar either the breach of contract or fraudulent inducement claims. *Id.*

On appeal, the Fifth District affirmed that portion of the circuit court's order denying summary judgment on the breach of contract claim, but reversed that portion of the order denying summary judgment on the fraudulent inducement claim. *Id.* at 34-35.

On the breach of contract claim, the Fifth District found that although no explicit legislative waiver of sovereign immunity exists for breach of contract, our supreme court has recognized an implied waiver of sovereign immunity exists for breach of contract. *Id.* at 33 (citing *Pan–Am Tobacco Corp. v. Dep't of Corrs.*, 471 So. 2d 4 (Fla. 1984), for the proposition that because the Legislature authorizes state entities to enter into contracts, the Legislature clearly intended that such contracts be valid and binding on both parties).

However, on the fraudulent inducement claim, the Fifth District found no implied waiver of sovereign immunity, reasoning, in pertinent part:

The legislature has waived sovereign immunity in tort for personal injury, wrongful death, and injury or loss of property. *See* § 768.28, Fla. Stat. (1995). Fraud in the inducement

10

causing only economic loss does not fit within any of those categories of injury or loss enumerated in the statute. Section 768.28 states that sovereign immunity for liability in tort is waived, but only to the extent specified in the statute. Moreover, fraud in the inducement is a tort independent of breach of contract. *Pan–Am* recognized the waiver of sovereign immunity to breach of contract actions, and its holding has not been extended to include the tort of fraudulent inducement causing only economic loss. Sovereign immunity has not been waived as to this type of tort, so the trial court erred in not granting the county's motion for summary judgment as to that count.

*Id.* at 34.

*Miorelli*'s reasoning applies equally here. CCA lacks an express contract with the City, and lacks a claim for personal injury, wrongful death, or injury or loss of property against the City. The waiver of sovereign immunity has not been extended to include the claim upon which CCA relies here – economic damages framed in counts for declaratory relief, promissory estoppel, tortious interference with contract, and tortious interference with advantageous business relationship. Thus, the circuit court erred in denying the City's motion to dismiss those counts on sovereign immunity grounds.

This conclusion is not only consistent with *Miorelli,* but with other cases applying sovereign immunity to bar recovery of economic damages against a municipality for the denial of a development application. *See Akin v. City of Miami,* 65 So. 2d 54, 55-56 (Fla. 1953) (the granting or withholding of a building permit by a municipality exercises a purely governmental function, and thus the municipality could not be held liable in a tort action for damages for the wrongful refusal to issue such a permit); *Paedae v. Escambia Cty.,* 709 So. 2d 575, 578 (Fla. 1st DCA 1998) (county's interpretation of its comprehensive plan and refusal to issue a permit based on that interpretation is a governmental function which is protected by sovereign immunity); *City of Cape Coral v. Landahl, Brown & Weed Assocs., Inc.,* 470 So. 2d 25, 27 (Fla. 2d DCA 1985) (no cause of action exists for the manner in which a municipality exercises its governmental function of issuing or refusing to issue permits, thus those actions are immune from an action for damages); *City of Live Oak v. Arnold,* 468 So. 2d 410, 412 (Fla. 1st DCA 1985) ("[I]nsofar as the city's defense of sovereign immunity is focused on its actions in denying issuance of the permit based upon its reading of its own code of ordinances, the defense is viable.").

## *Conclusion*

Based on the foregoing, we reverse and remand for entry of a final order dismissing, on sovereign immunity grounds, Count I for declaratory judgment, Count II for promissory estoppel, Count V for tortious interference with contract, and Count VI tortious interference with advantageous business relationship.

*Reversed and remanded.*

CONNER, J., and METZGER, ELIZABETH, Associate Judge, concur.

\*      \*      \*

***Not final until disposition of timely filed motion for rehearing.***