# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D2021-1857

_____

THE UNIVERSITY OF FLORIDA
BOARD OF TRUSTEES, and THE
FLORIDA BOARD OF GOVERNORS,

    Appellants,

    v.

LISA BROWNING, individually;
JULIANA BOISSE, JONATHAN
CHARLES, MAX CHERN, and
MICHELLE GRESSER, on behalf of
themselves and all other
similarly situated,

    Appellees.

_____


On appeal from the Circuit Court for Alachua County.
Monica J. Brasington, Judge.

April 3, 2024


LEWIS, J.

Appellants, the University of Florida Board of Trustees and the Florida Board of Governors, challenge the trial court's non-final Order Granting in Part and Denying in Part Defendants' Motions to Dismiss, asserting that sovereign immunity bars the claims against them for negligent misrepresentation, conversion, and declaratory judgment. The Board of Governors argues, and

we agree, that the trial court erred in denying its motion to dismiss as to all those claims against it because, under the circumstances of this case, there is no basis for waiving the Board's sovereign immunity under section 768.28, Florida Statutes (2021), and holding it vicariously liable. We also agree with Appellants that sovereign immunity bars the declaratory judgment claims against them. We affirm the denial of the Board of Trustees' motion to dismiss as to the negligent misrepresentation and conversion claims without discussion. Accordingly, we affirm in part, reverse in part, and remand with instructions.

## BACKGROUND

Appellees, Lisa Browning, individually, and Juliana Boisse, Jonathan Charles, Max Chern, and Michelle Gresser, on behalf of themselves and all other persons similarly situated, filed a twenty-two-count Third Amended Class Action Complaint against Appellants, alleging that the University of Florida ("UF") charged prospective students a non-refundable application fee in excess of the statutory maximum amount of $30 and charged admitted students a preview orientation fee in excess of the statutory maximum amount of $35 as set forth in section 1009.24(14), Florida Statutes (2021). According to Appellees, the UF Board of Trustees is responsible for setting the application and orientation fees charged. Appellees did not allege any specific actions on the part of the Board of Governors or its representatives or employees. Nor did Appellees allege that they had any transactions or interactions with the Board of Governors or its employees. Instead, they based their claims against the Board of Governors solely on vicarious liability given its constitutionally mandated duties of oversight over the state university system.

The Third Amended Complaint contained claims for breach of contract, rescission of contract, breach of fiduciary duty, negligent misrepresentation, conversion, and declaratory judgment. In addition to seeking damages for their tort claims, Appellees sought in the declaratory judgment counts a declaration that the Board of Trustees unlawfully charged non-refundable application and preview orientation fees in excess of the statutory maximums and that Appellees are entitled to repayment of those excess amounts.

2

Each Appellant filed a Motion to Dismiss or, in the Alternative, Motion for Judgment on the Pleadings, arguing in part that the claims are barred by the doctrine of sovereign immunity. Following a hearing on the motions, the trial court entered an Order Granting in Part and Denying in Part Defendants' Motions to Dismiss, in which it dismissed with prejudice the breach of contract, rescission of contract, and breach of fiduciary duty counts upon finding they are barred by sovereign immunity because no enforceable written or express contract exists between the parties. The court denied the motions with regard to the negligent misrepresentation, conversion, and declaratory judgment counts, which are the only counts at issue on appeal, finding that they are not barred by sovereign immunity. This appeal followed.

## ANALYSIS

Our review of the trial court's ruling on a motion to dismiss a complaint based on sovereign immunity is *de novo*. *Desantis v. Geffin*, 284 So. 3d 599, 602 (Fla. 1st DCA 2019). We must accept as true the complaint's well-pleaded factual allegations and draw all reasonable inferences from the allegations in favor of the plaintiff. *Medina v. Pollack*, 300 So. 3d 173, 175 (Fla. 4th DCA 2020).

Sovereign immunity, which derives from the separation of powers provision of article II, section 3 of the Florida Constitution, protects the state and its subdivisions from civil liability unless such immunity is waived by legislative enactment or constitutional amendment. *Fla. Fish & Wildlife Conservation Comm'n v. Hahr*, 326 So. 3d 1165, 1167 (Fla. 1st DCA 2021) (citing article X, section 13 of the Florida Constitution). The Florida Legislature codified a limited waiver of sovereign immunity for tort actions in section 768.28, Florida Statutes, which provides in pertinent part as follows:

> (1) In accordance with s. 13, Art. X of the State Constitution, the state, for itself and for its agencies or subdivisions, hereby waives sovereign immunity for liability for torts, but only to the extent specified in this act. Actions at law against the state or any of its agencies

3

or subdivisions to recover damages in tort for money damages against the state or its agencies or subdivisions for injury or loss of property, personal injury, or death caused by the negligent or wrongful act or omission of any employee of the agency or subdivision while acting within the scope of the employee's office or employment under circumstances in which the state or such agency or subdivision, if a private person, would be liable to the claimant, in accordance with the general laws of this state, may be prosecuted subject to the limitations specified in this act. . . .

. . . .

(9)(a) An officer, employee, or agent of the state or of any of its subdivisions may not be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property. . . . The exclusive remedy for injury or damage suffered as a result of an act, event, or omission of an officer, employee, or agent of the state or any of its subdivisions or constitutional officers is by action against the governmental entity, or the head of such entity in her or his official capacity, or the constitutional officer of which the officer, employee, or agent is an employee, unless such act or omission was committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property. The state or its subdivisions are not liable in tort for the acts or omissions of an officer, employee, or agent committed while acting outside the course and scope of her or his employment or committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

§ 768.28, Fla. Stat. (2021).

4

We agree with the Board of Governors that there is no basis for waiving its sovereign immunity under section 768.28 and holding it vicariously liable. An "employee" is defined as "[s]omeone who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance." *Employee*, Black's Law Dictionary (11th ed. 2019). Appellees have not alleged that UF employees are also the employees of the Board of Governors. In fact, the Third Amended Complaint is devoid of any allegation of wrongdoing on the part of an employee of the Board of Governors or even the Board itself.

Appellees' claims against the Board of Governors for vicarious liability were not based on an employer-employee or agency relationship, but solely on the Board of Governors' general constitutional and statutory oversight responsibilities over the state university system, which is insufficient for imputing liability to the Board. *See* § 768.28, Fla. Stat.; *see also McGhee v. Volusia Cnty.*, 679 So. 2d 729, 733 (Fla. 1996) ("We thus conclude that the intent behind the 1980 amendments [to section 768.28(9)(a)] was to extend the veil of sovereign immunity to the specified governmental employees when they are acting within the scope of employment, *with the employing agency alone remaining liable* up to the limits provided by statute." (Emphasis added)). As such, under the circumstances of this case, there is no basis for applying section 768.28's limited waiver of sovereign immunity to the Board of Governors.

We further agree with Appellants that they are immune from Appellees' declaratory judgment claims. Sovereign immunity is the rule, not the exception, and a waiver of sovereign immunity must be unequivocal and will not be found by inference. *Hahr*, 326 So. 3d at 1167. "Outside of claims brought under the federal or state constitutions, sovereign immunity bars suit against the State. This is an absolute rule with only two exceptions." *Univ. of Fla. Bd. of Trs. v. Rojas*, 351 So. 3d 1167, 1170 (Fla. 1st DCA 2022). The first exception is when the Legislature waives the State's immunity by general law. *Id.* The second exception is when the State enters into an express, written agreement with a private entity. *Id.* Here, Appellees' declaratory judgment claims are not brought under the federal or state constitutions, and

5

neither exception to sovereign immunity applies to the claims. The claims are not based on an asserted contractual relationship; indeed, the trial court found that no enforceable written contract exists between the parties.

"Sovereign immunity does not exempt the State from a challenge based on violation of the federal or state constitutions . . . ." *Dep't of Revenue v. Kuhnlein*, 646 So. 2d 717, 721 (Fla. 1994). Cases for declaratory relief against governmental entities that proceeded without an express waiver of sovereign immunity involved constitutional violations. *City of Fort Lauderdale v. Hinton*, 276 So. 3d 319, 325 (Fla. 4th DCA 2019); *see also, e.g., Bradsheer v. Fla. Dep't of Highway Safety & Motor Vehicles*, 20 So. 3d 915, 916, 921 (Fla. 1st DCA 2009) (reversing the dismissal of the count seeking declaratory or injunctive relief and remanding for the trial court to consider whether the Department violated the state prohibitions against depriving liberty or property without due process and unauthorized agency penalties); *City of Jacksonville v. Jacksonville Mar. Ass'n, Inc.*, 492 So. 2d 770, 771–72 (Fla. 1st DCA 1986) (affirming the final judgment declaring invalid the "user fees" provided in a City ordinance and directing the City to refund certain fees paid under the ordinance because the "user fee" was an illegal tax unauthorized under by the Florida Constitution). Claims for declaratory relief based on a constitutional violation existed even before the enactment of section 768.28. *See Westwood Lake, Inc. v. Dade Cnty.*, 264 So. 2d 7, 8 (Fla. 1972) (reflecting that the plaintiff filed a declaratory decree contesting the constitutionality of a county ordinance); *Rosenhouse v. 1950 Spring Term Grand Jury, in & for Dade Cnty.*, 56 So. 2d 445, 446 (Fla. 1952) (explaining that the plaintiff's bill for declaratory decree and injunctive relief challenged the constitutionality of certain statutes). Here, Appellees have not alleged any constitutional violation. Instead, they alleged only a violation of section 1009.24 and asserted that Appellants' sovereign immunity is waived by virtue of section 768.28.

A statute must be given its plain and obvious meaning when its language is unambiguous, and courts may not extend, modify, or limit the statute's express terms or its reasonable implications. *Searcy, Denney, Scarola, Barnhart & Shipley v. State*, 209 So. 3d 1181, 1189 (Fla. 2017). Section 768.28 by its plain language waives

6

sovereign immunity only for "liability for torts," "to recover damages in tort"; it does not waive immunity for declaratory judgment claims. *See* § 768.28(1), Fla. Stat. Nor does section 1009.24 waive sovereign immunity or authorize a cause of action for refunds of unlawfully charged fees. *Cf.* § 215.26(1), Fla. Stat. (2021) (authorizing the Chief Financial Officer to refund any moneys paid into the State Treasury that constitute "[a]n overpayment of any tax, license, or account due," "[a] payment where no tax, license, or account is due," and "[a]ny payment made into the State Treasury in error"). Simply stated, the State has not waived immunity from suit for Appellees' declaratory judgment claims pursuant to law. Therefore, Appellees' declaratory judgment claims are barred by sovereign immunity because the claims do not seek to establish certainty as to some aspect of a contractual relationship between the parties, the claims are not based on an asserted constitutional violation, and the State has not waived immunity from suit for the claims pursuant to law.

In denying Appellants' motions to dismiss as to the declaratory judgment claims, the trial court cited *Bill Stroop Roofing, Inc. v. Metropolitan Dade County*, 788 So. 2d 365 (Fla. 3d DCA 2001), as a case where the court allowed a declaratory judgment claim to proceed against the government under similar circumstances. Bill Stroop Roofing, Inc. brought an action for "declaratory decree and other relief," contending that the County charged state-certified contractors a fee in violation of section 489.113(4)(a), Florida Statutes. *Id.* at 366. The Third District agreed, stating that "[t]he trial court should have so declared, and enjoined the County from charging the forbidden additional fee." *Id.* The court further concluded that the government is "required to refund taxes and fees illegally exacted, and the doctrine of sovereign immunity is inapplicable thereto." *Id.* at 368. Without citing any authority in support, the court rejected the County's contention that refunds of illegal tax or fee exactions are subject to sovereign immunity defenses unless the action is based on a constitutional violation. *Id.* at 367–68. To the extent *Bill Stroop Roofing, Inc.* holds that sovereign immunity does not bar a declaratory judgment action against the State even when the claim is not based on an alleged constitutional violation and the State has not waived immunity pursuant to law for such claim, we certify conflict with the Third District's decision.

7

For the foregoing reasons, we reverse the trial court's denial of the Board of Governors' motion to dismiss Appellees' Third Amended Class Action Complaint. We also reverse the court's denial of the Board of Trustees' motion to dismiss as to Appellees' declaratory judgment claims. Accordingly, we remand the case to the trial court with instructions to dismiss with prejudice all claims against the Board of Governors, as well as the declaratory judgment claims against the Board of Trustees. We affirm the trial court's denial of the Board of Trustees' motion to dismiss as to the negligent misrepresentation and conversion claims.

AFFIRMED in part, REVERSED in part, and REMANDED with instructions; CONFLICT CERTIFIED.

LONG, J., concurs in part and dissents in part with opinion; TANENBAUM, J., concurs in result in part and dissents in part with opinion.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____

8

LONG, J., concurring in part and dissenting in part.

I concur that the Board of Governors is not vicariously liable for the actions of the Board of Trustees and is entitled to sovereign immunity. I also agree to affirm the conversion and negligent misrepresentation claims as to the Board of Trustees. The Court correctly rejects Judge Tanenbaum's theory that one's money is not one's property.

I dissent, however, from the Court's decision on the declaratory judgment claim. Appellees sought a declaratory judgment in their complaint. They sought a declaration that the fees charged exceeded the statutory maximums and were unlawfully obtained, and a declaration that they were entitled to a reimbursement. The trial court denied Appellants' sovereign immunity-based motion to dismiss this claim. The trial court found that because Appellees were seeking money damages for loss of property, section 768.28's waiver of immunity applied. I agree with my colleagues that section 768.28 does not waive sovereign immunity for declaratory judgment actions. But I would affirm on a different ground.

I agree with *Bill Stroop Roofing v. Metro. Dade Co.*, 788 So. 2d 365 (Fla. 3d DCA 2001). Actions to recover unlawful taxes and fees were never barred by sovereign immunity. Sovereign immunity is a separation of powers doctrine. And states do not enjoy sovereign immunity when they act in violation of their controlling constitutions. *Dep't of Revenue v. Kuhnlein*, 646 So. 2d 717, 721 (Fla. 1994) ("Sovereign immunity does not exempt the State from a challenge based on violation of the federal or state constitutions, because any other rule self-evidently would make constitutional law subservient to the State's will."). As recognized in *Bill Stroop*, the Florida Constitution enshrines special protections against unauthorized government takings and provides that "[n]o tax shall be levied except in pursuance of law" and "[n]o person shall be deprived of life, liberty or property without due process of law . . . ." Art. VII, § (1)(a), Art. I, § 9, Fla. Const. And *Bill Stroop* held that an action for a declaratory judgment to determine the legality of a tax or fee is necessarily a constitutional claim because "any tax not authorized by law is unconstitutional." *Bill Stroop*, 788 So. 2d at 367; *see also Broward Cnty. v. Mattel*, 397 So. 2d 457, 460

9

(Fla. 4th DCA 1981).  I view this as a straightforward application of organic law: The constitution prohibits imposing unlawful fees and taxes.  A declaratory action can be used to declare a tax or fee unlawful and therefore in violation of the constitution. Supplemental relief can then be sought.[1]

I agree that our decision today conflicts with *Bill Stroop*, but I disagree with the majority's characterization of the conflict.  It is not whether sovereign immunity bars "a declaratory judgment action against the State even when the claim is not based on an alleged constitutional violation."  Instead, it is about the nature of the claim and whether it alleges a constitutional violation in the first place.  If it alleges a constitutional violation, then it is not barred by sovereign immunity.

The fees here are set out by the Legislature.  While there is a difference between a fee and a tax,[2] "once the illegality of either is established, the prerequisites for recovery are the same."  *Id.* at 367; *Ves Carpenter Contractors, Inc. v. City of Dania*, 422 So. 2d 342, 344 n.2 (Fla. 4th DCA 1982).  Sovereign immunity does not bar the declaratory judgment action against the Board of Trustees.

TANENBAUM, J., concurring in result in part and dissenting in part.

Both the University of Florida Board of Trustees ("UF") and the Florida Board of Governors ("BOG") (collectively, the "university defendants") are sovereign state entities. There is no dispute about that. Their sovereignty gives them total immunity from suit in the State's courts when plaintiffs, like the ones here,

---

[1] Whether a declaratory action can look backwards to address a previous transaction is a question for another day.  Here we address only whether sovereign immunity bars the declaratory action.  The answer is no.

[2] For more detail, observe *Jacksonville Port Auth. v. Alamo Rent-A-Car, Inc.*, 600 So. 2d 1159, 1162 (Fla. 1st DCA 1992), and *Contractors & Builders Ass'n of Pinellas Cnty. v. City of Dunedin*, 329 So. 2d 314 (Fla. 1976).

seek purely economic damages, and that is true regardless of the labels they put on their putative causes of action. The whole complaint against the university defendants should have been dismissed. I concur, then, in vacating[1] the parts of the trial court's order that deny the entities' motion to dismiss. Additionally, I agree with Judge Lewis's conclusion that the Legislature's waiver of sovereign immunity for "damages in tort" is not so broad as to include the plaintiffs' efforts to seek declaratory judgment against the university defendants, so I join his certification of conflict with *Bill Stroop Roofing*. Finally, I agree with Judge Lewis that section 1009.24, Florida Statutes, is not a waiver of immunity or an authorization for suit to recover statutorily excessive fees.

Otherwise, I must dissent insofar as the rest of the panel has chosen to allow the plaintiffs and a putative class to go after these two sovereign entities for purely *economic* loss allegedly suffered from a supposed conversion of the plaintiffs' funds and because of putative negligent misrepresentations. The Legislature's waiver of sovereign immunity—strictly construed, as it must be—does not extend so far.

I

As indicated in the opening, I support Judge Lewis's conclusion regarding dismissal of the declaratory judgment counts, but I want to add a few comments. First, I take issue with Judge Long's recharacterization of the declaratory judgment counts regarding $30- and $35-new-student fees as having some constitutional dimension. The only way to get there is through article VII, section 1(a), of the Florida Constitution: "No tax shall be levied except in pursuance of law." Seriously, though, the student fees we all had to pay in college hardly resemble taxes. "In common parlance a tax is a forced charge or imposition, it operates whether we like it or not and in no sense depends on the will or contract of the one on whom it is imposed." *State ex rel. Gulfstream Park Racing Ass'n v. Fla. State Racing Comn'n*, 70 So. 2d 375, 379 (Fla. 1953). Attendance at a university in Florida is a voluntary

---

[1] The main opinion uses the term "reverse" for the disposition, but this is not technically correct because we do not have on review a judgment or a dismissal with some *res judicata* effect.

act. If a student does choose to attend, he or she will be subject to several fees and costs to offset university expenses.

Moreover, unlike taxes, fees taken in by a university are not considered state revenue and are not deposited into the State's treasury. *Compare* § 1011.42(1), Fla. Stat. (requiring each board of trustees to "designate the depositories in which any university funds may be deposited"); *id.* (2) (requiring that all funds received by a university, "from whatever source and for whatever purpose, [] promptly be deposited in" the aforementioned depositories); *id.* (6), (7), Fla. Stat. (allowing each university president to move university funds around for different purposes and requiring each board of trustees to "designate" check signatories "to pay legal obligations of the university"), *with* § 215.31, Fla. Stat. (requiring revenue, including fees, "collected or received under the authority of the laws of the state" to "be promptly deposited in the State Treasury," not to be paid out without an appropriation); § 17.52, Fla. Stat. ("No moneys shall be paid out of the treasury except on such warrants or other orders of the Chief Financial Officer or Comptroller."); § 17.57(1)(b), Fla. Stat. (requiring the chief financial officer to "deposit the money of the state or any money in the State Treasury in such qualified public depositories of the state"); § 17.58(1), Fla. Stat. (requiring that all moneys collected by state institutions "be deposited" in the treasury, "except as otherwise provided by law").

State universities, in fact, are not treated as typical state agencies for budgeting purposes, and they are not appropriated funds as if they were. *See* § 1011.41, Fla. Stat. (providing for funding of "general operations" of universities by grant-in-aid). Still, universities must charge the fees described in section 1009.24. *See* § 1009.24(2), Fla. Stat. (requiring that "[a]ll students [] be charged fees"). Their compliance with the Legislature's fee policies is a condition of their receipt of funds granted from the Legislature. *See* § 1011.41, Fla. Stat. (stating that legislative funding is "contingent upon each university complying with the tuition and fee policies established in the proviso language and with the tuition and fee policies for state universities included in part II of chapter 1009," including section 1009.24). In turn, if a university charges more for a fee than what the Legislature has authorized, that is a matter between the university and the

Legislature, not one to be battled out in the courts. It certainly is not a matter of a constitutional dimension, as Judge Long suggests.

My next point regarding the declaratory judgment counts at issue here is that they do not really seek declaratory relief. Instead, they essentially ask the trial court to determine whether a tort or some other wrong was committed in the past. They do not express doubt about their "rights, status, or other equitable or legal relations" being "affected by a statute, or any regulation made under statutory authority," such that they need determined "any question of construction or validity arising under such statute [or] regulation" or "a declaration of rights, status, or other equitable or legal relations thereunder." § 86.021, Fla. Stat. This use of chapter 86 in the retrospective is not proper, because the purpose of the chapter is to give trial courts the authority to declare "the existence, or nonexistence," of "any immunity, power, privilege, or right" or any fact upon which the existence or non-existence of one of these "right *now* exists or will arise *in the future*." § 86.011, Fla. Stat. (emphasis supplied).[2] Regardless,

---

[2] *See also* § 86.051, Fla. Stat. (allowing for a declaration to be "rendered by way of anticipation with respect to any act not yet done or any event which has not yet happened" and providing that "the judgment shall have the same binding effect with respect to that future act or event"); *Sheldon v. Powell*, 128 So. 258, 263 (Fla. 1930) ("The common-law judgment cannot be secured until a right has been invaded or an injury imposed, while the declaratory decree contemplates that parties may be in doubt as to their rights, and that they may have a judicial determination of them *before* wrong has been committed or damage done." (emphasis supplied)); *id.* at 262 ("In its inception, the purpose of the declaratory judgment was to serve as an instrument of preventive justice, to render practical help in determining issues, and to adjudicate the rights or status of parties, without the peril of committing a crime or resorting to violence or breach to put the legal machinery in motion. *It is inhibitory of injury*." (emphasis supplied) (internal quotations omitted)); *Seaside Town Council, Inc. v. Seaside Cmty. Dev. Corp.*, 347 So. 3d 89, 100–01 (Fla. 1st DCA 2021) (Tanenbaum, J., dissenting) (providing historical context of the

13

though, of whether these counts properly were pleaded under chapter 86, to the extent the counts could be read as an alternative means to recover in tort, the university defendants still are immune because on the face of these counts, the plaintiffs clearly seek to recover only for what they consider to be *economic* loss. And that leads to a critical point, which I discuss in detail in the next part: The Legislature has not waived sovereign immunity for suits seeking such loss of funds, akin to contract or expectation damages—*i.e.*, the loss of value through some economic transaction, as opposed to through some act causing physical harm to property.

## II

Now for why, in my view, no count pleaded in the complaint fits within the limited immunity waiver set out in section 768.28, Florida Statutes, thereby necessitating dismissal of the whole thing (including, of course, the conversion and negligent misrepresentation counts). Simply put, read narrowly, the immunity-waiver text allows only for tort suits of the type that seek recovery for damage to or destruction of real property or chattel. Under this properly narrow reading, then, the waiver does not include the suit that the plaintiffs bring: to recover funds they say the university defendants improperly or tortiously obtained from them as payment. The majority necessarily has applied—without explicitly saying so—a more expansive reading of the waiver-text, contrary to what the supreme court requires.[3]

## A

"The doctrine of sovereign immunity, which provides that a sovereign cannot be sued without its own permission, has been a

---

declaratory judgment act and its prospective, preventative purpose).

[3] Regrettably, the majority has opted not to provide an explanation for its affirmance regarding the conversion and negligent-misrepresentation counts. That means, however, there is no court holding tied to the affirmance. The analysis that follows

fundamental tenet of Anglo–American jurisprudence for centuries and is based on the principle that 'the King can do no wrong.'" *Am. Home Assurance Co. v. Nat'l R.R. Passenger Corp.*, 908 So. 2d 459, 471 (Fla. 2005). It "was a part of the English common law when the State of Florida was founded and has been adopted and codified by the Florida Legislature." *Id.* (citing section 2.01, Florida Statutes).

There are three policy justifications for this doctrine. First, and perhaps most importantly, it preserves the "constitutional principle of separation of powers." *Id.*; *Kaisner v. Kolb*, 543 So. 2d 732, 737 (Fla. 1989) (reaffirming "that governmental immunity derives entirely from the doctrine of separation of powers"); *Com. Carrier Corp. v. Indian River County,* 371 So. 2d 1010, 1022 (Fla. 1979) (stating that "certain functions of coordinate branches of government may not be subjected to scrutiny by judge or jury as to the wisdom of their performance"); *see also Wallace v. Dean*, 3 So. 3d 1035, 1044–45 (Fla. 2009) (characterizing sovereign immunity in terms of a lack of subject-matter jurisdiction in that it "may shield the government from an action in its courts"). Second, sovereign immunity protects the public fisc. *See Am. Home Assurance Co.*, 908 So. 2d at 471; *see also Spangler v. Fla. State Tpk. Auth.*, 106 So. 2d 421, 424 (Fla. 1958) (noting that sovereign immunity "is a part of the public policy of the state" that "is enforced as a protection of the public against profligate encroachments on the public treasury"). Finally, it maintains "the orderly administration of government." *Am. Home Assurance Co.*, 908 So. 2d at 471.

In the light of these considerations, it makes sense that the Florida Constitution gives the Legislature *exclusive* authority to waive the State's sovereign immunity. *Id.*; *see* Art. X, § 13, Fla. Const. ("Provision may be made by *general law* for bringing suit against the state as to all liabilities now existing or hereafter originating." (emphasis supplied)). In other words, *only* the Legislature gets to spell out the extent to which the State may be sued and the parameters of such suits—and it will do so in the text

in this opinion hopefully will prove helpful to judges and counsel when considering the scope of the immunity waiver in other cases.

of the law it enacts. Section 768.28 is the Legislature's waiver of that immunity in tort. Because a *law* is required to waive immunity, courts *do not* have the authority to redefine the scope of any immunity waiver. Moreover, out of respect for the Legislature's exclusive role here and "to protect public funds," the supreme court directs that courts construe immunity waivers *narrowly*, hewing closely to what is explicit in the text. *Hardee County v. FINR II, Inc.*, 221 So. 3d 1162, 1165–66 (Fla. 2017); *see Spangler*, 106 So. 2d at 424 (noting that "statutes purporting to waive the sovereign immunity must be clear and unequivocal," and that to enforce the State's public policy, "[w]aiver will not be reached as a product of inference or implication").

Indeed, there is a practical side to narrowly construing immunity-waiver statutes. When we construe a word (or combination of words) in a statute—like we supposedly are doing here—we are considering that word as "the linguistic expression of a term." PETER KREEFT, SOCRATIC LOGIC 40 (2014 ed. 3.1); *see id.* at 41 (explaining how "different words in many different languages" can express "the same stable term"). A term, meanwhile, "is simply any word or group of words that denotes one object of thought." *Id.* Every term has two components: its "comprehension" (its "inner meaning" or "connotation") and its "extension" (its "denotation" or "all the real things the term refers to"). *Id.* at 43–44. Assessing a term involves both components. *Id.* at 44–45. Consideration of comprehension is qualitative and involves "all the attributes or qualities or characteristics meant by" the term—the "essential nature" of the object of thought being expressed. *Id.* at 44–46; *see also id.* at 123 ("A definition tells us what a thing is." (emphasis removed)). A term's extension, by contrast, is quantitative: telling us what set of things is grouped by the term based on its comprehension. The two components are inversely related. Adding attributes to increase comprehension gives more meaning to the term but narrows its extension, *i.e.*, the scope of things that the term references, and *vice versa. Id.* at 45.

If we are to define a word itself, rather than the term it represents, we are looking for a "nominal definition," which really "answer[s] the question, 'How is this word used?' rather than 'What is this thing?'" *Id.* at 125. An argument over meaning with respect to a nominal definition, then, will be in reference to

16

"socially constructed conventions rather than universal objective truths." *Id.* at 127. There nevertheless will be the same two inversely related components of definition: comprehension and extension. If we define a word by its more general social usage, we necessarily decrease its comprehension (*i.e.*, its meaning) and increase its extension (*i.e.*, its usage, or scope of things to which it refers). Contrariwise, if we define a word by how it has conventionally been used in a more specific sense, we give the word more meaning, because the narrower context of usage adds to the "attributes or qualities or characteristics" included within the word. This expansion of meaning in turn narrows the scope of "things" to which the word refers.

This philosophical understanding about what we are doing informs the practical aspect of our interpretative endeavor. Take a word with two usages, one general and one specific.[4] The set of things within scope of the specific would include no more than what would be within the set covered by the general usage. If we apply a word's specific usage in a case, then, we can be assured that we have effectuated the whole of the policy adopted by the Legislature—and nothing more. The same, however, cannot be said about going with the general usage over the specific: The general usage will include what the specific covers *plus* some additional things that are *not* included under the specific usage.

When it is called for, narrow construction of an ambiguous word in a statute means choosing the more specific conventional usage of the word over the more general. The specific usage carries with it more comprehension, a richer meaning. A richer meaning, in turn, narrows the scope of what is included within the word as used in a statute. When we do this—say in the context of a sovereign-immunity waiver—we significantly reduce the risk of our erroneously expanding (read: judicially modifying) a legislative

---

[4] A word with different usages, or meanings, is ambiguous. *See* PETER KREEFT, SOCRATIC LOGIC 47 (2014 ed. 3.1) ("Ambiguous means having more than one meaning." (internal quotations omitted)). Statutory construction, at bottom, is a judicial exercise in picking the usage that best reflects the policy enacted by the Legislature.

policy to include things that are outside the boundaries properly enacted through the process set out in article III of the Florida Constitution.

Despite the absence of an explanation or holding from the majority, its decision to sustain the conversion and negligent-misrepresentation counts stands in contravention of this directive to narrowly construe and preserve the Legislature's decision to waive immunity under only the circumstances that it specified. As I am about to discuss, the waiver in section 768.28 contains a key ambiguous word—"property." I will demonstrate that the historical usage of "property," especially its usage in the context of the words surrounding it in the statute, is more specific than the more recent alternative usage that the majority implicitly adopts. In its sustaining of the conversion and misrepresentation counts, the majority necessarily has chosen a usage of "property" that includes money (*i.e.*, economic loss) within its scope of extension—without any explanation as to why, or even an acknowledgment of the ambiguity.[5] Whatever the reasoning, the majority's approach now effectively exposes the State's coffers to these enterprising litigants in a way the Legislature has not authorized.

B

The Legislature has chosen to waive immunity only for torts. *See* § 768.28(1), Fla. Stat. (waiving "sovereign immunity for liability for torts, but only to the extent specified in this act"); *Pan-Am Tobacco Corp. v. Dep't of Corr.*, 471 So. 2d 4, 5 (Fla. 1984) (noting that "[t]here is no analogous waiver in contract"); *see also* Ch. 73-313, § 1, at 711, Laws of Fla. (enacting waiver language

---

[5] Judge Long misses the mark with his passing quip (I can only assume) that I somehow am suggesting a person's money is not his or her property. Nonsense. My analysis has nothing to do with legal theory or political philosophy. All I address here is what should be a faithful effort at *narrowly* discerning the meaning of the word "property" *as it is used in the immunity-waiver statute*. It should go without having to say that a word can be given a more narrow meaning under an accepted canon of construction without that construction being labeled an effective rejection of other, broader meanings that the word could carry in other contexts.

that now is section 768.28(1)). The waiver, however, does not extend to *all* suits in tort.

Rather, the Legislature has limited the waiver in terms of the type of damages sought. The waiver allows the State to be subject to suit in its own courts *only* for "[a]ctions at law" (as opposed to in equity) and *only* "to recover damages in tort for money damages . . . *for injury or loss of property, personal injury, or death.*" *Id.* (emphasis supplied); *cf. id.* (5)(a) (excluding punitive damages and prejudgment interest from the waiver). Had the Legislature intended to waive immunity for all tort suits for damages, then there would be no reason for the highlighted prepositional phrase. This phrase, then, must be a further narrowing of the immunity waiver, so we should pay careful attention to getting the meaning behind this text right.

That attention is particularly warranted here. The plaintiffs seek recovery of funds they collectively paid over to the university defendants. When looking at the limitation quoted in the preceding paragraph, one can see that the university defendants' immunity claim turns on whether the recovery of ill-obtained funds constitutes a "loss of property." The plaintiffs do not seek recovery for damage to or loss of their real property or chattel. They claim a loss of their money, or the value of what they perceive to be their contracted expectation. They seek to be made whole through compensation, then, only for *economic* damage they claim to have suffered. To address the university defendants' immunity claim, we should be analyzing whether the word "property," as it used in the waiver limitation, includes the concept of money[6] within its scope of reference.

It should be clear that "property" is an ambiguous word, as it is used in the waiver. The history that I provide below highlights this point. The ambiguity requires a proper textual construction to find the correct meaning behind the waiver. The majority's

---

[6] By "money" here, I mean the abstract concept of money operating as a medium of exchange. This usage is distinguishable from the word's more specific usage, as will be discussed below, to refer just to the physical, transportable representations of money like coins or paper notes.

disposition "without discussion" fails to address this question. For the majority, apparently, "property" must include pretty much everything that can be owned, even intangibles like money. This unelaborated approach, however, would obviate any effect of the highlighted text as a legislative limitation on the immunity waiver, thereby running counter to at least a couple well-established principles of textual analysis.

The constitution requires a more robust judicial effort. Economic loss is the obvious type of damage excluded by "injury or loss of property." If "injury or loss of property" includes economic loss, what is left? We either read these words to exclude this alternative type of damage, or we improperly render the words surplusage. *See Heart of Adoptions, Inc. v. J.A.*, 963 So. 2d 189, 198–99 (Fla. 2007) ("Moreover, a basic rule of statutory construction provides that the Legislature does not intend to enact useless provisions, and courts should avoid readings that would render part of a statute meaningless." (internal quotation and citation omitted)). *Hechtman v. Nations Title Ins. of N. Y.*, 840 So. 2d 993, 996 (Fla. 2003) ("It is an elementary principle of statutory construction that significance and effect must be given to every word, phrase, sentence, and part of the statute if possible, and words in a statute should not be construed as mere surplusage."); *Johnson v. Feder*, 485 So. 2d 409, 411 (Fla. 1986) ("We are compelled by well-established norms of statutory construction to choose that interpretation of statutes and rules which renders their provisions meaningful.").

There is a reasonable, more specific usage of "property" in this space. If the majority were to abide by the supreme court's directive to narrowly construe an immunity waiver (and faithfully effectuate the waiver only insofar as the Legislature enacted), it would have no choice but to vacate (rather than affirm) the trial court's denial of the university defendants' claims of immunity. The remainder of this opinion addresses the specific usage of "property" that should apply to support dismissal of the plaintiffs' complaint.

1

The Legislature uses words to reflect state policy, and those words carry certain specialized meaning, depending on the context

20

and moment in history when they are enacted. The statute at issue here was enacted in 1973. Discerning how the word "property" is used in the statute requires consideration of the words surrounding it. It is used in the prepositional phrase "for injury or loss of property, personal injury, or death," which modifies (read: limits) the type of "money damages" (the antecedent of that phrase) that may be recovered against the State. The prepositional phrase itself is modified by the participial phrase that follows it: "caused by the negligent or wrongful act or omission of any [state] employee. . . ." As I will show, all this language taken together, including the word "property," is rooted in the ancient common law—a fact relevant both at the time of the waiver's 1973 enactment and now. *See* § 59, *Revised Statutes* (1892) (declaring the "common and statute laws of England which are of a general and not of a local nature . . . down to the 4th day of July, 1776, . . . to be of force in this State"); § 2.01, Fla. Stat. (1973) (same); § 2.01, Fla. Stat. (2023) (same); *cf. Waller v. First Sav. & Tr. Co.*, 138 So. 780, 784 (Fla. 1931) (analyzing and determining application of old English common-law principles); *Gates v. Foley*, 247 So. 2d 40, 43 (Fla. 1971) (same); *Hoffman v. Jones*, 280 So. 2d 431, 435–36 (Fla. 1973) (same); *Tomlinson v. State*, 369 So. 3d 1142, 1147 (Fla. 2023) (looking to "settled legal meaning at English common law" to interpret statute); *id.* ("Where Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." (quoting *NLRB v. Amax Coal Co., a Div. of Amax, Inc.*, 453 U.S. 322, 329 (1981))).[7]

---

[7] *Cf. Tomlinson*, 369 So. 3d at 1146 ("When, in discerning what a statute requires, we encounter a word with more than one meaning, we look for the original meaning of the statutory text to keep us from overriding the bargain struck in the Legislature and signed by the Governor, that is, the law that governs us."); *id.* ("And when (as often happens) a word had more than one accepted meaning at that time, we decide which one is the law by looking to the context in which it appears, and what history tells us about how it got there.").

The common law historically made a clear distinction between recovery of "money" (*i.e.*, economic losses), on the one hand; and for bodily injury and damage or destruction of physical "property," on the other. As to the former, economic loss could stem, for instance, from a failure of an expectation under contract. It could stem from a deprivation of an ownership interest. In any case, though, the common law did not equate "economic loss" with a loss of "property." *See* Property, BOUVIER'S LAW DICTIONARY (1856) ("The right and interest which a man has in lands and chattels to the exclusion of others."). Recompense for *economic* loss, in turn, consistently has resembled contract damages, as contract law developed first based on tort law, and later evolved separately from tort law. In turn, recovery was not for "loss of property"; it was for return of money owed. *See* BENJAMIN J. SHIPMAN, HANDBOOK OF COMMON-LAW PLEADING 39 (2d ed. 1895) (defining "debt" as "a liquidated or certain sum of money due [the plaintiff]" and describing action of debt as one to recover debt "based upon contract," either express or implied, or on "quasi-contractual obligations having the force and effect of simple contracts"); *id.* at 41 (describing an action of debt as lying "to recover money lent, money paid by the plaintiff for the use of the defendant, money had and received by the defendant for the use of the plaintiff, or the balance due on an account stated . . . for work and labor . . . [and] for goods sold and delivered, or bargained and sold"); *id.* at 46–47 (describing "action of account" as one arising "ex contractu" and lying "where one has received *goods or money* for another, to ascertain and recover the balance due" (emphasis supplied)); *see also id.* at 11–13 (describing "action of assumpsit" as a "proper remedy for the breach of any simple or parole contract . . . whether it is for the payment of money, or for the performance of some other act, as to render services or deliver goods, or for the forbearance to do some act"); *id.* at 19 (explaining that "general assumpsit" also is called "the common counts," which will lie to recover "for money paid by the plaintiff for the use of the defendant," "for money had and received," "for money lent," and "for a balance due on account stated"); *id.* at 20 (defining "money counts" as those common counts relating "to money transactions as the basis of the debt"); *id.* at 28–30 (describing how money counts under general assumpsit provide vehicles by which to seek repayment of "money so obtained" in situations "where one person by means of fraud, duress, trespass, or any other tort, obtains another's money, and

converts it to his own use, or obtains his property and sells the same, and converts the proceeds"; and also "to recover money paid by mistake, as where money is paid as due upon the basis of erroneous accounts").[8]

The supreme court from early on has recognized these money counts. *See S. States Power Co. v. Pittman*, 165 So. 893, 895 (Fla. 1936) (recognizing "common count" as lying "for money had and received upon a consideration of money obtained through imposition or through an undue advantage taken of the plaintiff's situation"); *Cullen v. Seaboard Air Line R. Co.*, 58 So. 182, 184 (Fla. 1912) (recognizing common count "for money had and received by the defendant for the use of the plaintiff" as lying for recovery of excess charges, "whether the charges exacted are in excess of reasonable rates at common law or are in *excess of rates prescribed and made prima facie reasonable under statutory authority*" (emphasis supplied)); *Gordon v. Camp*, 2 Fla. 422, 428 (1849) (*rejecting* argument that action for money had and received would not lie to recover money paid over, because "*property* paid or received *as money* will support the action for money paid, or *had*

---

[8] Justice Holmes described these same common-law actions for the recovery of money. *See* OLIVER WENDELL HOLMES, THE COMMON LAW 269–70 (Dover ed. 1991) (explaining that "debt was the time-honored remedy on every obligation to pay money enforced by law, except the liability to damages for a wrong"); *id.* at 252 (explaining that the "substance of the plaintiff's claim as set forth in the writ of debt is that the defendant owes him so much [money] and wrongfully withholds it," and that the claim is based on "a duty to pay on any ground"); *id.* at 275–82 (describing development of assumpsit as common-law vehicle for contract damages based on trespass action and then action for trespass-on-the-case, with the common-law action originally limiting liability "to damage to person or property arising after the defendant had entered upon the employment" under contract); *id.* at 322–24, 327–39 (explaining how the common law treated damages for misrepresentations and deceit (fraud) as contract, or expectation, damages).

*and received*, the same as if money itself had been paid or received").[9]

Actions for trover and conversion, meanwhile, differ in form from the money counts described above, but the recovery these actions allow—essentially for economic loss—are very similar. The economic loss in these situations—through a common-law fiction—are essentially for the wrongful transfer of a possessory interest in the property taken. OLIVER WENDELL HOLMES, THE COMMON LAW 144 (describing trover and conversion actions as being based on an interference "with the real owner's right of possession"); *id.* at 98–99 (describing damages for a defendant's wrongful detention of another's chattel as the equivalent of requiring the defendant to "pay over its value" as a sum owed). Notably, the "property" at issue in a trover and conversion action is limited to chattel—tangible, moveable goods.[10] Blackstone, in his treatment of this area, expressly limits the definition of personal property to "goods, money, and all other *moveable* chattels, and things thereunto incident." 3 BLACKSTONE'S COMMENTARIES *144 (emphasis supplied); *see also* 2 BLACKSTONE'S COMMENTARIES *384 (describing personal property as tangible, "things *moveable*"); *id.* at *387 (defining "chattels personal," as opposed to "chattels real," as "things *moveable*; which may be annexed to or attendant on the person of the owner, and carried about with him from one part of the world to another").

---

[9] The Legislature recognized these counts as well. *See* § 2648, *Revised Gen. Statutes* (1920) (setting sufficient statements of declaration for causes of action for money counts and actions on contract); §§ 51.01, 51.02, 51.03, Fla. Stat. (1949) (setting sufficient statements of declaration for causes of action for money counts and actions on contract). These provisions later were repealed as being "superseded by the existing common law rules." Ch. 26962, Laws of Fla. (1951).

[10] The fact that the plaintiffs do not seek damages for conversion of *chattel*—only for an historically unrecognized conversion of funds—further highlights my point. The plaintiffs seek only economic loss and not damages for harm to or loss of "property," as that term is more narrowly defined.

Blackstone, meanwhile, clearly makes a distinction between "money" as a medium of exchange, and "money" as "personal property," referring to "money" in this context only in the physical sense, because personal property at the time was considered to be something "that can properly be put in motion, and transferred from place to place." 2 BLACKSTONE'S COMMENTARIES *387; *see also* 3 BLACKSTONE'S COMMENTARIES *144 (referring to "money" as something tangible—capable of "attend[ing] a man's person where he goes, and from thence receives its denomination."). Trover and conversion indeed required that "the thing detained" be ascertainable, such that "it may be specifically known and recovered." 3 BLACKSTONE'S COMMENTARIES *151. "Therefore it cannot be brought for money, corn, or the like: for that cannot be known from other money or corn; *unless it be in a bag or sack*." *Id.* (emphasis supplied); *see also* BENJAMIN J. SHIPMAN, HANDBOOK OF COMMON-LAW PLEADING at 68 (explaining that an "action for trover and conversion" requires, among other elements, that the plaintiff have "property in the thing," that he was "in the actual possession, or entitled to the immediate possession," and that the conversion involved the taking, carrying away, wrongful assumption or detention of "*goods*" (emphasis supplied)); *id.* at 70–71 (explaining that trover and conversion is limited to "personal property" and that such an action "will lie for so many pieces of money taken and converted by the defendant" but not for "money had and received generally"). For Blackstone, the taking of property (as in conversion) is not the same as causing physical "abuse or damage of the chattels." 3 WILLIAM BLACKSTONE, COMMENTARIES *145; *see also id.* at *151–52. That is, the harm involved in a conversion is the loss of possession and use of chattel; the chattel itself has not been harmed or destroyed. The remedy in that case is payment of the value of the chattel at the time it was taken or detained.

In contrast to these common-law actions for the recovery of money *owed* in a variety of ways, there was really but one, distinct, common-law action that allowed for recovery of damages for *physical* harm. The ancient action of trespass traditionally was the vehicle "for the recovery of damages for an injury to the person [or] property." BENJAMIN J. SHIPMAN, HANDBOOK OF COMMON-LAW PLEADING at 50. For "injury to property," the property must have been "in the actual or constructive possession of the plaintiff at the

time of the injury," and the injury had to be caused by "force, actual or implied." *Id.* at 50–51; *see also* OLIVER WENDELL HOLMES, THE COMMON LAW 192, 195–96 (discussing "loss" in the context of chattels or goods); *see generally id.* at 77–129 (describing evolution of common-law action for trespass to hold defendant liable for physical or tangible harm to person or property caused by his act); *but cf.* SHIPMAN, HANDBOOK OF COMMON-LAW PLEADING at 86–93 (describing "action on the case," "trespass on the case," or just "case" as a form of action that allows for damages for harm suffered to intangible rights and interests, because there could be no physical violence inflicted on such a right or interest, which is required for trespass); *id.* at 93 ("If the injury is to corporeal property, and is immediate, and committed with force, case will not lie merely because that property was the means by which an incorporeal right was enjoyed."); *id.* (explaining that when an "incorporeal right is invaded, the redress is by action on the case," but when "visible, tangible, corporeal *property* is injured, if the injury be direct, immediate, and willful, trespass is the proper form of action . . . ."); *id.* at 94–96 (consistently referring to tangible personal property when referring to recovery for tortious injury to property rather than equating intangible rights and interests with such property). Notably, the distinction is woven through Blackstone's extended treatment of common-law suits for injury to personal and real property. *See, e.g.*, 3 WILLIAM BLACKSTONE, COMMENTARIES *144–153 (distinguishing between financial loss from lack of use when one's property is dispossessed, on the one hand, and damage suffered to the thing itself, which "tak[es] from the value of any of [the owner's] chattels or making them in a worse condition than before"); *id.* at *223–29 (describing as "waste" a loss to the substance of real property, rather than just economic losses suffered from loss of use).

I lay all this out to make a critical point about construing section 768.28(1): Limiting the waiver to damages only for "injury or loss of property, personal injury, or death," and then only such injury or loss "caused by the negligent or wrongful act or omission" of a state employee, mirrors the common law's clear, ancient distinction between actions to recover for harm to or destruction of

chattel and actions to recover economic losses.[11] This parallelism amply supports a more specific usage of the word "property" here, a usage that carries with it the additional "attributes" that the historical context provides. These additional attributes increase "comprehension" and narrow the word's extension, or scope. A narrow construction of the immunity waiver, which is mandated, dictates that "property," as it is used in the term "injury or loss of property," be treated and applied in this narrow sense to exclude the purely economic losses that the plaintiffs sought in their negligent misrepresentation and conversion counts.

2

If that were not enough, the supreme court's long history of making the distinction between recovery for tangible property damage and for economic loss provides additional support. *See, e.g.*, *Casa Clara Condo. Ass'n, Inc. v. Charley Toppino & Sons, Inc.*, 620 So. 2d 1244, 1246 (Fla. 1993) ("The [economic loss] rule is the fundamental boundary between contract law, which is designed to enforce the expectancy interests of the parties, and tort law, which imposes a duty of reasonable care and thereby encourages citizens to avoid causing physical harm to others." (internal quotation and citation omitted)); *id.* (defining "economic losses" as "'disappointed economic expectations,' which are protected by contract law, rather than tort law"); *id.* at 1247 (holding that "contract principles [are] more appropriate than tort principles for recovering *economic loss* without an accompanying *physical injury or property damage*" (emphasis supplied)); *AFM Corp. v. S. Bell Tel. & Tel. Co.*, 515 So. 2d 180, 181–82 (Fla. 1987) ("We conclude that without some conduct resulting in *personal injury or property damage*, there can be no independent tort flowing from a contractual breach which would justify a tort claim solely for *economic losses*." (emphasis supplied)); *see also Curd v. Mosaic Fertilizer, LLC*, 39 So. 3d 1216, 1222 (Fla. 2010) (allowing fishermen to recover for loss of income

---

[11] I have not addressed the common-law's treatment of actions for damage to real property and interests related to real property because doing so is not necessary in this analysis. Still, I acknowledge that this waiver likely is broad enough to allow actions for those damages as well.

as "economic damages," even though they "do not own any real or personal property damaged by the pollution"); *id.* (distinguishing between recovery "for damages to real or personal property" and recovery for economic damages caused by damage to natural resources under the statute); *id.* at 1223 ("As a general principle of common law negligence, some courts have not permitted recovery for purely *economic losses* when the plaintiff has sustained no *bodily injury or property damage.*" (emphasis supplied)); *cf. U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871, 889 (Fla. 2007) (noting how "faulty workmanship or defective work that has damaged the otherwise nondefective completed project has caused 'physical injury to tangible property' within the plain meaning of the definition in the policy," but that "[i]f there is no damage beyond the faulty workmanship or defective work, then there may be no resulting 'property damage'"); *Peoples Gas Sys. v. Posen Constr., Inc.*, 322 So. 3d 604, 614 (Fla. 2021) (treating the term "losses" as synonymous for "damages" and noting that by itself, the term would include "*economic damages* that are independent of *personal injury or property damage*" (emphasis supplied)); *Monsanto Agr. Prods. Co. v. Edenfield*, 426 So. 2d 574, 576 (Fla. 1st DCA 1982) ("Tort law imposes upon manufacturers a duty to exercise reasonable care so that the products they place in the marketplace will not harm persons or property.").[12]

Finally, additional support for the narrower reading of "property" can be found in the Legislature's consistent statutory distinction between "property" and "money." The Legislature routinely refers to money as "money" when it uses the word in the medium-of-exchange sense. It rarely, if ever, uses the word "property" to include a reference to money in that same sense, instead using the words "monies" or "moneys" to refer to money as

---

[12] *See also* Note, *Economic Loss in Products Liability Jurisprudence*, 66 COLUM. L. REV. 917, 918, 929 (May 1966) (discussing how "property damage" and "economic loss" are "usually readily distinguishable"); Fleming James Jr., *Limitations on Liability for Economic Loss Cause by Negligence: A Pragmatic Appraisal*, 25 VAND. L. REV. 43, 43–46, 50 (Jan. 1972) (discussing difference between recovery for physical damage to chattel and for economic loss).

tangible property. *See, e.g.*, § 624.605(1)(a), (b), (d), (g), (l), (p) Fla. Stat. (1973) (referring separately to insurance for "*loss of or damage to . . . property* while contained" in a vehicle; insurance against liability for "death, injury, or disability of any human being, or for damage to property"; coverage for "*loss of or damage to* moneys, coins, bullion, securities, notes, drafts acceptances or any other valuable papers and documents"; coverage against "*loss or damage to property* or interest"; and "insurance against liability for any other kind of *loss or damage to person or property*" (emphasis supplied)); § 716.02, Fla. Stat. (1973) (referring to "[a]ll money or other property"); § 716.07(1), (4), Fla. Stat. (providing for recovery of escheated "property, funds or money delivered to the state," and referring to "money or property" and "property, money, or funds claimed"); § 116.23, Fla. Stat. (1973) (referring to forfeiture of "personal property or chattels personal listed, used, offered, or received in evidence"); §§ 402.17, 402.18, Fla. Stat. (1973) (referring repeatedly to "money" and "funds" received or held); *see also* § 513.114(1), Fla. Stat. (1983 Supp.) (exonerating operator of recreational vehicle park from "obligation to accept for safekeeping any physical "properties" like "moneys, securities, jewelry, or precious stones of any kind belonging to any guest"); § 68.082, Fla. Stat. (1994 Supp.) (referring to "possession, custody, or control of property or money"); § 550.1645, Fla. Stat. (1993) (referring to "money or other property"); § 717.129, Fla. Stat. (1987) (referring to "a claim for money or property").

3

The way I see it, the university defendants are immune from the plaintiffs' suit because it claims nothing but economic damages. The plaintiffs seek money that they contend the university defendants should return because UF either overcharged them or took advantage of them. Those claims are classic money counts at common law, seeking the return of money owed, not damages for "injury or loss of property." *See Pittman*, 165 So. at 895 (recognizing "common count" as lying "for money had and received upon a consideration obtained through imposition or through an undue advantage taken of the plaintiff's situation"); *Cullen*, 58 So. at 183–84 (recognizing common count "for money had and received by the defendant for the use of the plaintiff" as lying for recovery of excess charges, "whether the

29

charges exacted are in excess of reasonable rates at common law or are in *excess of rates prescribed and made prima facie reasonable under statutory authority*" (emphasis supplied)). The immunity waiver, strictly construed, does not cover those claims. In the end, we have a duty to construe the immunity waiver in section 768.28(1) as narrowly as reasonably possible while remaining true to the text. I believe I have set out an approach that best fulfills that duty.

The majority takes the opposite tack: implicitly (but "without discussion") applying "property" in its broader sense and *presumably* finding a waiver of immunity that a narrower-yet-still-reasonable sense cannot support. As I noted at the beginning of this part, the objective when we are narrowly construing an immunity waiver is to *minimize, if not eliminate*, the risk that we end up reading the waiver to include matters that it was not drafted to include. In other words, our goal here should be to do no harm to the Legislature's carefully crafted waiver—to avoid encroachment upon the Legislature's exclusive authority to precisely set the parameters of any waiver of sovereign immunity. The majority's disposition sustaining the conversion and negligent representation counts—and the expansive reading of "property" on which it has to have relied—seriously risks just such an encroachment.

At all events, that disposition cannot be reconciled with centuries of history, supreme court directives, or statutory usage with respect to the word "property." I dissent from the majority's affirmance of the conversion and negligent misrepresentation counts.

## III

Allow me to close with an observation. Reading the waiver to exclude economic damages, like those sought by the plaintiffs in this case, is commensurate with the textual purpose of the statute. SCALIA & GARNER, READING LAW 19–20 (describing how "the textualist routinely takes purpose into account, but in its concrete manifestations as deduced from close reading of the text"). As I already explained, only the Legislature—and not the courts—has the authority to waive sovereign immunity. The purpose of the statute is there in its opening words (to exercise the Legislature's

authority under article X, section 13 of the Florida Constitution), and we should read the statute in a way that leaves control over the scope of the immunity waiver with the Legislature.

Florida's courts over the decades have shown their willingness to arrogate to themselves (at the expense of the legislative power) the authority to expand quite liberally upon the English common law adopted by the Legislature as the substantive law. *Cf.* § 2.01, Fla. Stat. The courts repeatedly have found new duties and new causes of action unknown to English common law. *See, e.g.*, *Gilchrist Timber Co. v. ITT Rayonier, Inc.*, 696 So. 2d 334, 339 (Fla. 1997) (adopting Restatement's position establishing negligent misrepresentation as cause of action); *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 503 (Fla. 1992) (expanding scope of duty based on undertaker doctrine, in reliance on Restatement); *Wallace*, 3 So. 3d at 1052–54 (expanding the duty's scope even further to avoid sovereign immunity bar). If the Legislature were to set out a waiver of immunity merely in terms of theories of tort recovery, it would, for better or worse, effectively be ceding at least some of its exclusive authority over sovereign immunity waivers (and the treasury) to the judiciary.

The Legislature instead wisely has put the limited waiver in terms of types of damages: The State is *not* immune from suit in its courts when a plaintiff seeks to recover for actual harm to real property or chattel or to the plaintiff's body (including death), but it remains otherwise immune to efforts to recover *any other type damages*, including for economic loss. This way, regardless of the various novel tort theories that the judiciary may recognize in the future, the waiver will remain fixed in scope, based on the type of damages sought.

As I already noted above, the plaintiffs here clearly sued to recover only economic loss—indeed, based on several novel legal theories. The trial court's permissiveness toward this "creativity" could prove destructive to the legislative effort to limit the scope of the waiver. We should stay true to the Legislature's prerogative in this respect by narrowly applying the term "property" and putting an immediate stop to these enterprising plaintiffs' effort to gain legislatively unanticipated access to public funds.

* * *

I would vacate the trial court's order to the extent it denies the university defendants' motion to dismiss, and I would remand with an instruction that the trial court dismiss the complaint with prejudice.[13]

_____

Robert J. Sniffen, Matthew J. Carson, and Jeffrey D. Slanker of Sniffen & Spellman, P.A., Tallahassee, for Appellants.

Paul S. Rothstein of Paul S. Rothstein, P.A., Gainesville; Robert S. Peck of Center for Constitutional Litigation, P.C., pro hac vice, Washington, DC, for Appellees.

_____

[13] With respect to the majority's disposition on the negligent misrepresentation count, we at least should certify conflict with the Fourth District Court of Appeal, which has adopted my more limited reading of section 768.28(1). *See City of Pembroke Pines v. Corr. Corp. of Am., Inc.*, 274 So. 3d 1105, 1113 (Fla. 4th DCA 2019) (holding that trial court erred in denying motion to dismiss on immunity grounds because "waiver of sovereign immunity has not been extended to include [a] claim [for] economic damages framed in counts for declaratory relief, promissory estoppel, tortious interference with contract, and tortious interference with advantageous business relationship"); *id.* (relying on reasoning set out in *Brevard County v. Miorelli Eng'g, Inc.*, 677 So. 2d 32, 34–35 (Fla. 5th DCA 1996), *quashed on other grounds*, 703 So. 2d 1049 (Fla. 1997)). The majority offers no explanation for not certifying. Because the majority also fails to offer any analysis for how it resolved the ambiguity behind the use of "property" in the waiver, the majority's disposition likely will evade review by the supreme court, leaving unresolved what is otherwise a clear and irreconcilable conflict.